Judge Gould and I are glad to welcome Judge Chiavelli from the Central District of California who is sitting with us this week by designation. Thank you. So he's with us today and he'll be on another panel for two more days this week. There's a number of cases for argument here. If you haven't been to the Ninth Circuit before, welcome. And there is a clock up there to keep track of your time. You can save time for rebuttal. We'll try to help you out, but you should keep track of the time for yourself. Are you ready, Judge Gould? Yes, I am. Good morning. Good morning. Thank you. And the first case for argument this morning is Singh v. Mukasey. No, I think that's submitted. Is that submitted? Yeah, I have mine. I've got one that's submitted. I think it's submitted. Let me just see here. I think you've got the wrong. Oh, I'm sorry. So it will be. I think Singh and Aiken are both on the panel. That one has been submitted then. So we'll have Cosa v. Mukasey. Does that make you feel better? Unless you want to argue Singh. That you have the right client here? You're right. We'd like to startle you in the morning. Good morning. May it please the Court. Yadiv Sekho on behalf of the petitioner, Adriana Cosa. For purposes of this petition for review, the most striking feature about this case is the fact that there are incongruencies between the decision of the immigration judge, the decision of the Board of Immigration Appeals, and the government's defense of those decisions. First the immigration judge made the adverse credibility finding against Ms. Cosa that was based on a hodgepodge of impermissible reasons, including an aversion to Ms. Cosa's physical appearance and a perplexing discussion centering around the definition of evangelism. Well, but didn't it go a good deal beyond that? For example, the question on Old Testament versus New Testament, and she said she couldn't answer. I mean, pretty much everybody who studied the Bible knows there's a new persona who comes in in the New Testament that's kind of important. I mean, it seemed like she couldn't really respond to anything with respect to biblical references, and yet she was proselytizing for 13 months without incident except for the citizens, not the police. Your Honor, if I recollect the record correctly, I think all that was asked of her is what is, it was an open-ended question, what is the difference between the Old Testament and the New Testament? And I think without further guidance, her response was, I don't know what to say to that. I don't, so I think the fact that was an open-ended question, and I don't think that's an inappropriate response for her to say, I don't know the answer to that, or I don't know what you're getting at. And there also was a little confused, I know there was some discussion about the Gospels, and then, and maybe I read in one of the briefs, well, she didn't really know what they were, but then I read some testimony where I thought she actually named the, like Matthew, Mark, Luke, or, you know, the initial Gospels in the New Testament. Is that correct? Yes. She did, was able to name those? She made a mistake with respect to one of the books. But she had the, and then there's another reference that I can't figure out is it, whether it's a translation problem or a transcription problem, which may be Deuteronomy, that seems to run through the record. Could you clarify what you think that is saying? I think with respect to one of the books, and I'm not sure if it's the New Testament or the Old Testament, because I know very little of the Bible, there, it was pretty much, it seemed like there was an understanding that one of them is based on the Romanian translation of the word as opposed to the English translation of the word. So I think the record settled on the fact that she did misstate one of the books in the New Testament. Here seems to me to be one of the conundrums faced by the immigration courts and then on review to us to a lesser degree. You know, someone could come in and just fake a religion and say, well, I have this religious situation, and then, of course, I was prosecuted, persecuted, or mistreated. On the other hand, religions come in all shapes and sizes, and we have to be careful that the immigration judge is not prejudging from an American perspective as to what a religion might look like in another country. For example, this particular group supposedly had only eight people in that group, but only 7,000 in the country. So how, where, can you give us some guidance in terms of how you think the benchmarks ought to be so we'll know when does the IJ step over the line in terms of inserting himself or herself into what is a religion versus also being able to fairly make a credibility finding? Yeah, I think your question is fair. The immigration judge, I think, had every right to look at background documentation in the case. Ms. Colsa described this religion as a cult, an obscure cult. And she, the immigration judge, had every right to ask for some background documentation because, of course, you need to corroborate it in some way or another. And the fact is, when Ms. Colsa did, how she described the religion, how she described the pastor, the pastor, Russell, who started it, and the way she described that there is some connection between that's how the religion originated, and the immigration judge recognizing that that was consistent with what Ms. Colsa described, and then Ms. Colsa continuing to be a member of this religion, I think that is enough, given that Ms. Colsa isn't really alleging persecution based on, you know, the exact basis of belief of this religion, but merely because of the fact that her religion is a minority religion in Romania. Let me ask you about that, because as I recall from the record, there was 13 months, at least that she was a member of the religion, and I think was holding meetings on a weekly basis. She got interrupted or she got abused by the populace, with the police looking on and not doing anything. Then we had the two incidents, terrible to be sure, especially the second one involving her allegation that she was raped. But I guess my question is, is this really, I mean, a single crime by a couple of rogue police does not qualify necessarily for asylum. I'm not sure I see any sort of systematic state persecution of this religion, other than there were comments that they were heretic because it wasn't a registered religion. But as I recall, it was the same police who showed up the second week. And so it was a limited sort of situation in terms of is that really persecution. She had been proselytizing for a long time with no interruption. Yes, Your Honor. And if I may just go back to evidence, a discussion about the country conditions. You used the word heretic. And in the transcript, it is clear that in Romania, any partisan religion is referred to as repentant or heretic. So that evidences the type of country conditions there are in Romania. Answering your specific question, Your Honor, with the fact that first we have to examine whether the harm she suffered rises to the level of persecution based on her cumulative experiences. And clearly, the harm was severe enough. And then we look at... The question is, the harm was, no question, it was severe that she's alleged. Yes. No question about that. But the question is, is this just an isolated incident in a two-week period with the same officers who are rogue? And there's no indication that whether the police owned it or couldn't control them. So what you had was a two-week period after she'd been doing her work and having her meetings for 13 months. And it could have been, I mean, these are just two isolated incidents. The police were mad, they had to come back a second time. I mean, and wasn't the IJ fair in possibly making that interpretation? Was the IJ clearly wrong? I'm not sure, Your Honor, that the IJ reached the decision whether or not she satisfied the statutory eligibility. And under Thomas, if the court was to find that the adverse credibility finding is not supported by substantial evidence, we'll have to remand for that finding. And that's a change in my position in my briefs now. But I think to whether or not the persecution was perpetrated by the government or people the government was unwilling to provide that if the persecutor is a government official that satisfies that requirement, notwithstanding the fact that the government, that local official may be acting inconsistently with the policy the central government would prefer. Do you want to save your remaining time? Yes, Your Honor. Thank you. Thank you very much. Good morning. May it please the Court. Tom Dupree from the United States. I'd like to begin by addressing the question that Judge McKeown raised, because I do think it really goes to the heart of this case. And that is, how does an IJ test the allegations in a case where a petitioner comes forth claiming that she belonged to a particular religion and the IJ is not familiar with that religion and, as in this case, the petitioner failed to provide any evidence that the religion exists, particularly in the way and on the scale to which she testified. I think in this case, the IJ did something perfectly permissible, which is to take the petitioner's description of her faith on its own terms and then ask questions designed to elicit whether or not she was a member of this group, whether she had these beliefs and whether the group acted as it did. For example... The petitioner corrects the IJ kind of went overboard, was making assumptions on the religion and how people would act and said she was, I think, said she was sullen or something in responding to questions and this was not, she was not consistent with a forgiving nature. Where did the IJ get all of that? Well, Judge Schiavelli, that language that Your Honor is referring to, I think the IJ in her decision referred to the petitioner as severe in appearance. But I don't think that that is fairly construed as a basis for the adverse credibility determination. Certainly, the Board did not rely on it, but even, I think, a fair reading of the IJ's opinion didn't suggest that... It doesn't suggest that the IJ was making an assumption about millennists or whatever they were called, millennists, millennians, whatever, that was not borne out and may have colored how the IJ perceived the testimony, especially with the repeated efforts to strongly question her and to condemn reading from her declaration. As the petitioner shows, she tried to respond and was getting cut off. Well, again, I don't think that that really played a role in the IJ's determination. I think what the IJ was simply saying was that it was, I don't know the right word, interesting or anomalous that there was a woman who, on one hand... She was really looking at the demeanor of this person. I mean, it's kind of an odd thing. We don't know, I mean, I don't know any millenniasts, maybe, and the IJ doesn't know any millenniasts either. So the IJ then says, well, her demeanor doesn't emote this essential love, softness, acceptance. And her view of, like, the future of the second coming doesn't somehow comport with, you know, these tenets of the faith. So that's quoting from the, you know, from the transcript. It doesn't reflect love and acceptance and a warm tolerance. So it seems that the IJ is somehow inserting these beliefs as kind of an overlay. And we're a little hard-pressed, I think, to find documentation in this record for that. Well, I respectfully disagree with Your Honor's interpretation of those remarks. I think what was going on here was that the IJ was confronted with a religion with which she was not familiar. She, to her credit, the IJ, during a break in the proceedings, actually, she adjourned court to go do her own Internet research to try to learn more about it. And so I think that her remarks contrasting the Petitioner's demeanor with the beliefs that the Petitioner professed, I think, was simply a way of remarking on here's this new thing that I've been told about. Here are these beliefs. It's interesting that she holds these beliefs, given her demeanor. But again, I think the critical point for this Court's purpose is, is that was not the basis for the IJ's ruling. At the basis, another thing she says is it's preposterous that Cosa got baptized so quickly. I mean, these sort of things run throughout the transcript, as the IJ then is describing her. And so I'm having some trouble with those. Maybe a different way to ask the question would be, what do you think is the strongest basis for the adverse credibility finding? I think the Petitioner's failure to answer fundamental questions about her practice, her beliefs, her religion, on the terms that she herself put forth. In other words, as Judge Schiavelli correctly noted, the Petitioner testified that she spent 13 months of her life teaching, proselytizing. By her account, she was quite successful in that she converted two people. And yet, when asked a fundamental question, and again, the Petitioner testified that at heart, it is a Christian doctrine that she believes in. She did not know the difference between the Old and the New Testament, which I think is But this was kind of, you know, it's a difficult proceeding. And she was testifying, she knew who the head of the church was, I think it was Russell, she was able to talk about, talking about Armageddon as the beginning of the Millennist concern and faith, and everything was moving towards Armageddon, where we were going to go. It was a Christian faith. She knew there was no, you know, publications. But when you say she didn't know anything about the religion, as is pointed out by the Petitioner, there were a number of questions that she responded to that were off the cuff from the IJ, where she responded consistent with at least what she indicated were the tenets of the Millennist faith. That's right. And certainly if the posture of this Court's review were, could a reasonable fact finder have found that she was genuine, I would say yes. I think that would be a reasonable conclusion. But of course, that's not the test that this Court employs. The test this Court employs is, does the record compel the conclusion that she was credible and that she had these beliefs, that she belonged to this organization? And I think that the answer to that question has to be no, because there are simply too many holes, a failure to identify the Gospels, a failure to distinguish between the Old and the New Testament, those sorts of things. Well, I read the record. Coming back to Judge McCown's question, didn't she – I thought I read that she identified – that she may have made a mistake at first, but she identified Luke, and there was a question on the translation. I think she did, didn't she? Well, my understanding, and obviously I think – or I think the Petitioner's counsel agreed with this, is that she got three out of the four right. She missed Luke. A few seconds later, she did go to Luke. I thought I saw an answer where she mentioned Luke, but I may be wrong. Go ahead. And I'm sure the Petitioner – You know, we're sort of in this thing like you probably could go down to any shopping center church on a Sunday, and you'd be lucky for people to get three out of four. I mean, you know, I'm not quite sure – I'd hate to see it on jaywalking. – what we're imposing. And, Judge McCown, if the question were if you went up to a random adherent of the faith and gave them a pop quiz, I completely agree with Your Honor. But again, this was not a random adherent in the sense that this was someone who proselytized. The only document or item she carried around with her – there's no church literature. There was a Bible. This is her own testimony. She walked around with a Bible for 13 months, knocking on doors, saying, we want you to believe this. She succeeded in converting people. The fundamental document, what's the difference between the Old and the New Testament, I don't know. And I think that that in and of itself provides a substantial evidence predicate for this Court to affirm the adverse credibility ruling. All it takes is one ground of adverse credibility. And the only question is, does the record compel a contrary finding? And I would submit that the record does not compel a contrary finding in this case. And for that reason, we submit the petition for review should be denied. – If we were to disagree with you, I assume you would agree that it should go back. We shouldn't do anything more than send it back, correct? – In the unlikely event this Court would disagree – – In the unlikely event this Court might disagree. And I don't know. As you know, we don't caucus in advance. And we're asking these questions because we are trying to get to the heart of the matter, too. So we appreciate your candid responses. But there was some shift, of course, in the petitioner's position. But you would, I assume, invoke Ventura and say – – Yes. – That's the most anyone could do at this juncture. – Certainly, the proper result is to deny the petition. But in the event the Court disagreed, yes, I think we then would be appropriate.  And I think that controls in this case. I don't think the record compels a contrary result. – Thank you. – Thank you. – We have a minute plus for rebuttal. – Your Honors, I think we've – given that there's a large amount of testimony in this case regarding Milanist, Ms. Costa's beliefs, her description of her religion, the hierarchy of her religion, a lot of discussion about her interest in the Bible and what she – her favorite parts of the Bible. The fact that someone would be asked a kind of vague question as what is the difference between the Old Testament and the New Testament, and then she says, I don't know what to say to that, without a follow-up question, I don't think is enough for an adverse – – You said, suggested it was enough. But one thing you didn't touch on, on the declarations that came in, which seemed inconsistent with her position about the amount of persecution of the religion as a whole. I think there were locally about eight or ten, whatever number, of adherents. And she said everybody was hit, et cetera. Yet the declarations seemed not to mention it. You would think that would have come out. – I think, Your Honor, that – I think – well, the corroborating evidence with respect to the specific events of persecution that Ms. Costa provided, the declarations – and I'm surmising – but they said, I was a guest at this meeting, and the guests were beaten. And then they focused more on Ms. Costa because the purpose of the declarations was to corroborate Ms. Costa's claim. I think that was a strained, almost purposeful misreading on behalf of both the IAJ and the BIA to say that the declarations said that the Athean stated that they weren't persecuted or weren't beaten, when the Athean never said that. The Athean, at most, you could interpret it as an omission, but I don't even read it as an omission. – They were all slapped and then they were taken away and she remained, at least on the second occasion. – Yes, yes. – And yet none of them at least discussed anything that happened to them. They did make the general comment the people were beaten, but that's inconsistent with what she said, that they were slapped. I don't know whether that counts as beaten. But none of them indicated, I was hurt or I was beaten. So you have everybody saying, well, everyone's beaten, but nobody's saying they were. It's kind of odd. – Your Honor, again, I would not read that as an inconsistency. I think that's an omission. Because it could be read, I think it's very strange to read them saying, affirmatively saying, I was not beaten. – Thank you. – Thank you. – I think we have your argument in mind. The case just argued, Costa v. Mukasey is submitted. Thank both counsel for your arguments this morning. We'll next hear argument in the case of Costa v. Mukasey. I guess you can remain there, Mr. King.
judges: McKeown, Gould, Schiavelli